IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOSHUA ROBERT SPENCER                                                    PLAINTIFF

v.                                    Civil No. 2:18-CV-02017

OFFICER CHRIS SHORT                                                      DEFENDANTS
(Arkansas State Police, Troop H),
OFFICER DUSTIN BARENTINE
(Fort Smith Police Department)
and OFFICER KEITH SHELBY
(Fort Smith Police Department)

**OPINION AND ORDER**

Plaintiff proceeds in this matter *pro se* and *in forma pauperis* pursuant to 42 U.S.C. § 1983. Currently before the Court are Motions for Summary Judgment by Defendants Barentine and Shelby (ECF No. 31) and Defendant Short (ECF No. 35).

**I. BACKGROUND**

**A. Procedural Background**

Plaintiff filed his Complaint on January 30, 2018. (ECF No. 1). Noting that Plaintiff's Complaint was not on the court-approved form, the Court entered an Order on January 31, 2018 directing Plaintiff to submit an Amended Complaint. (ECF No. 6). Plaintiff did so on February 14, 2018. (ECF No. 8).

Plaintiff alleges his constitutional rights were violated on October 13, 2017 when excessive force was used during his arrest and by the denial of medical care for injuries he received during the arrest. Specifically, Plaintiff alleges Defendants Creek, Short, and Barentine kicked and punched him during his arrest. Plaintiff alleges he did not resist, he was on the ground, he said he was sorry, and he pleaded with the officers to stop. (ECF No. 8 at 4, 5, 6). Plaintiff alleges he received cuts and bruises from the actions of Defendant Creek and Defendant Barentine. (ECF

1

No. 8 at 4, 6). Plaintiff alleges he received a broken tooth from the actions of Defendant Short. (ECF No. 8 at 5). Plaintiff alleges the Jane Doe Officer at the Sebastian County Detention Center ("SCDC") denied him medical care for his injuries. (ECF No. 8 at 8).

Plaintiff proceeds against all Defendants in their official and personal capacities. (ECF No. 8 at 4-6). Plaintiff seeks compensatory, punitive, and nominal damages. (ECF No. 8 at 7).

Pursuant to PLRA preservice screening, Plaintiff's official capacity claims and his personal capacity claim for denial of medical care against Defendant Jane Doe were dismissed on March 12, 2018. (ECF No. 9). His personal capacity excessive force claims against Defendants Creek, Barentine, and Short remained for further consideration. (*Id*.).

On July 11, 2018, Plaintiff filed a Motion to Amend/Correct Complaint. (ECF No. 19). In his Motion, Plaintiff sought permission to voluntarily dismiss Defendant Creek and add Defendant Shelby. Plaintiff also stated that Defendant Short did not transfer him to an emergency room for medical treatment. (*Id*.). On July 18, 2018, Plaintiff's Motion to Amend/Correct was granted; Defendant Creek was removed as a Defendant from the case, and Defendant Shelby was added per Plaintiff's request. (ECF No. 20).

Defendants Barentine and Shelby filed their Motion for Summary Judgment on September 13, 2018. (ECF No. 31). Defendant Short filed his Motion for Summary Judgment on September 28, 2018. (ECF No. 35). On October 4, 2018, the Court entered an Order directing Plaintiff to respond to the Motions for Summary Judgment. (ECF No. 44). Plaintiff filed his Response on October 25, 2018. (ECF No. 45).

### B. The Chase and Arrest

There is no dispute regarding the following facts. On October 13, 2017, Plaintiff was observed driving a red Dodge one-ton diesel flat-bed truck that had been reported stolen. (ECF Nos. 33 at 1; 36 at 1; 36-4 at 15-16). Defendant Short was advised by dispatch that the Fort Smith

Police Department (FSPD) was in pursuit of the truck. (ECF No. 36 at 1). Defendant Short met the truck as it was traveling westbound on Rogers Avenue just east of the intersection at 74th Street, with no police units pursuing it. (*Id*.). The truck swerved and came within three feet of hitting Defendant Short's vehicle head-on. (*Id*.). Short turned his vehicle around, activated his lights and siren and began pursuing the stolen truck. (*Id*. at 1-2). Over the course of about ten (10) minutes,[1] Plaintiff led Defendant Short and FSPD officers on a high-speed chase through Fort Smith, avoiding stop sticks, traveling through a business parking lot, and ramming civilian vehicles. (ECF Nos. 31-4 at 17; 33 at 1). The road route of the chase was:

1. South on 74th Street;
2. West on Phoenix Avenue;
3. The intersection of Phoenix Avenue and Old Greenwood Road, where Plaintiff struck two vehicles and then continued on Phoenix Avenue;
4. South on 24th Street;
5. West on Savannah Street;
6. South on Jenny Lind Road;
7. West on Zero Street;
8. North on 14th Street;
9. West on Vicksburg Street;
10. North on Towson Avenue; and,
11. Right turn into the parking lot of Village South Apartments.

---

[1] In his deposition Plaintiff testified that the chase took approximately 40-45 minutes. (ECF No. 31-4 at 17). In his Response to the Summary Judgment Motion, however, he states he only eluded police "for a few minutes." (ECF No. 45 at 1). Review of the dashcam video from Defendant Short's vehicle shows the chase continued for about nine minutes before Plaintiff was stopped and surrendered. (ECF No. 31-2, Exhibit 1).

(ECF No. 36 at 2). In the parking lot, Defendant Short pulled up to the driver side of the truck to try and box Plaintiff in, and contact was made between the truck and the state police vehicle. The truck stopped and Plaintiff put both hands out of the open window. (ECF Nos. 31-4 at 20; 36 at 3).

Defendants Short, Barentine, and Shelby approached the vehicle with their service pistols drawn and gave verbal commands for Plaintiff to open the truck door. When Plaintiff did not do so, Shelby opened the driver side truck door, and with Short, pulled Plaintiff down from the truck and down to the ground. (ECF Nos. 31-4 at 13-14; 33 at 2; 36 at 3). Before Plaintiff was handcuffed, Short struck him in the head and shoulder area/side (ECF Nos. 31-4 at 25; 36 at 4), and Shelby used his knee and hand to deliver some controlled blows. (ECF Nos. 31-4 at 30-31; 33 at 2). Plaintiff was then handcuffed and Short placed him in the state trooper vehicle. (ECF Nos. 31-2 at 2-3; 31-4 at 32; 36 at 4). The time spent on the ground was brief.[2] Plaintiff does not allege any force was used against him once he was handcuffed. (ECF No. 31-4 at 34).

Plaintiff sustained minor abrasions to his face and upper arm. (ECF Nos. 31-1 at 9-12; 31-4 at 34; 33 at 3; 36 at 4). He was taken to SCDC, where he was seen by a nurse the same day he was booked in. The abrasions were cleaned, did not require further medical treatment or sutures, and they healed with no permanent issues. (ECF Nos. 31-4 at 35; 33 at 3; 36 at 5). Plaintiff was also seen by a doctor and received pain medication at some point. (ECF No. 31-4 at 35; 45 at 4).

There are several disputed facts concerning Plaintiff's removal from the truck and the actions which occurred while Plaintiff was on the ground but not yet handcuffed. Defendants state Plaintiff was noncompliant when removed from the truck, struggling and refusing to offer his hands to be handcuffed. (ECF Nos. 33 at 2; 36 at 3). Short was concerned that Plaintiff might

---

[2] Review of the dashcam video from Defendant Short's vehicle shows Plaintiff was on the ground about one minute before being handcuffed and stood up. (ECF No. 31-2, Exhibit 1).

have a weapon in his waistband, and he therefore used his hands to strike Plaintiff three times in the head and shoulder area. (ECF No. 36 at 4). Defendant Barentine used his knee and hand to deliver "a few controlled blows" to Plaintiff's upper arm and shoulder area to try to gain control of his arms so he could be handcuffed. At the same time, Defendant Shelby was pulling on one of Plaintiff's arms to place it behind Plaintiff's back. (ECF No. 33 at 2). Defendants state there was no evidence of any dental issues as a result of the arrest. (ECF No. 37 at 19).

Plaintiff states he did not disobey any orders during the arrest. He told the police that he could not open the truck door and kept his hands raised. (ECF No. 45 at 3). He disputes that he gave any indication that he had a weapon in his waistband. (*Id*. at 2). He also states he was on his stomach, not on his side or his back while on the ground. (*Id*. at 3). He alleges he received a broken tooth from the actions of Defendant Short. (ECF No. 8 at 5). He states this tooth was removed by a dentist while he was incarcerated in SCDC. (ECF No. 45 at 4).

### C. Dashcam Video

The Court reviewed the dashcam videos provided by Defendants. The dashcam DVD submitted with the Shelby affidavit (ECF No. 31-2, Exhibit 1) provides the most information due to the angle of the patrol car and the active participation of the patrol car in the chase.[3] The video file is labelled as being from Defendant Short's dashcam. The video begins with Defendant Short heading eastbound on Rogers Avenue at the South 74th Street intersection. As Defendant Short travels eastbound, the truck being driven by Plaintiff is seen swerving into oncoming traffic in front of the patrol car. The truck swerved back and barely avoids hitting the patrol car. The truck continues at high speed away from Defendant Short, despite activation of lights and sirens. Upon

---

[3] The other videos, labelled Exhibit 3 to Defendant Shelby's Affidavit (ECF No. 31-2) and Exhibit 3 to Defendant Barentine's Affidavit (ECF No. 31-1), were reviewed. These videos were taken from cars on the passenger side of the stolen truck and provide very little opportunity to view what happened when Plaintiff was removed from the truck.

5

approaching the intersection of Phoenix Avenue and Airport Drive near the Home Depot, Plaintiff leaves the road, runs up over a curb, and drives across a field to avoid cars stopped at the stoplight. He then crosses Airport Drive and goes through the Home Depot parking lot at high speed, narrowly missing a pickup truck exiting the parking lot and nearly hitting a parked car. Plaintiff wove through the intersection on Phoenix Avenue in front of the Phoenix Pavilion shopping center at high speed. At the intersection of Phoenix Avenue and Old Greenwood Road, the Plaintiff rammed between a pickup and a sedan stopped at the red light, shoving them aside and continuing through the intersection. Whenever Defendant Short gets close to the truck, Plaintiff swerves the truck left to keep the car from approaching on the driver's side. Defendant Short states to dispatch that "he knows I'm trying to pit him out." (ECF No. 31-2, Exhibit 1).

As the vehicles approach the River Valley Inn and Suites, several police cars with lights on can be seen coming from the opposite direction. Plaintiff swerves into the parking lot of the inn and then into a parking area near some apartments. Plaintiff slams on the brakes briefly and then continues forward. As Defendant Short's patrol car begins to pull up parallel to the truck, Plaintiff swerves left in front of the patrol car, then back to the right. There appears to be some contact between the two vehicles, but the driver side door of the truck is unobstructed.

Plaintiff opens the driver side window and puts his head and arms outside the window. Three officers approach the door, two pointing service pistols at Plaintiff. There are shouted commands for Plaintiff to put his hands up and at least two verbal commands to open the door. Plaintiff says something in response, but he does not open the door and keeps his hands raised above his head. The truck door appears to be locked, and two officers reach into the window to open the door while one officer keeps his service weapon targeted on Plaintiff. Plaintiff is told not

6

to move, but he backs away slightly into the truck as they reach for him. Plaintiff is pulled out of the truck and taken to the ground.

Once the two officers have Plaintiff on the way down to the ground, the third officer joins them on the ground. Due to the positioning of the dashcam, Plaintiff is not visible, as he is directly in front of the patrol car. The officers are partially visible. Based on the physical motions of the officers, there is a struggle. At least two knee strikes and at least two hand strikes are administered by one officer. Plaintiff is told to put his hands behind his back three times. Toward the end of the struggle, Plaintiff yells, "OK, OK please stop," and it sounds as though he is crying. One officer is heard to tell Plaintiff to "stop your crying." Two other officers then approach the scene, and Defendant Short is seen reaching for his handcuffs.

Plaintiff is raised to his feet wearing handcuffs with his hands behind his back. The time elapsed from when Plaintiff is pulled from the truck until he stands up handcuffed is approximately one minute. As he is being raised up, he says "I'm sorry." He tells the officers he is scared and apologizes. He is able to stand on his own. The pockets of his pants had been turned out while he was on the ground, and an officer tosses his wallet onto the hood of the patrol car. Some red abrasions are visible on the right side of his forehead, but there does not appear to be any blood running down his face. He is walked off the dashcam screen by Defendant Short. As he is walked off the screen he apologizes again and is told to shut-up.

A second video on this DVD (ECF No. 31-2, Exhibit 1) shows the back-seat view of Defendant Short's patrol car. For a short time, one can hear audio of events taking place outside the vehicle while the camera is focused on an empty seat. From this audio, it appears that Plaintiff yells "OK" several times. Plaintiff admits to drinking that morning. Plaintiff is placed in the back of the car, directly in front of the camera. He has abrasions on his right forehead, an abrasion or

scratch on his right cheek, and either bruises or dirt on the right side of his face. There is no apparent injury to Plaintiff's mouth. This is consistent with the photographs of Plaintiff's injuries.[4]

Plaintiff is conscious and coherent, speaking to an officer off-camera. He repeats that he was scared. He says he found the truck by the side of the road that morning. He leans across the seat to talk to someone and raise himself back up again without any apparent difficulty or pain. Plaintiff converses with Defendant Short on the drive to the Sebastian County Detention Center (SCDC). He asks the name of the officers who pulled him from the truck. He asks what his fastest speed was during the chase. He repeatedly apologizes. With his head down, muffled, and at times incomprehensible, he appears to question why he was taken to the ground. He continues apologizing. He shakes his head repeatedly and says he was just trying to make it to a safe zone. There was no discussion of his injuries, no statement that he was in pain, and no request for medical care.

### D. Plaintiff's Deposition Testimony

Plaintiff testified that he did not think the measures taken by the officers during his arrest were necessary because he had pulled over and surrendered. He told them he could not open the truck door because he thought the patrol car had him "jammed in" due to the way it was parked. He admitted that was in error on his part, because the police were able to open the door and pull him out. (ECF No. 31-4 at 13-14). He thought the chase lasted about 40 to 45 minutes. (*Id*. at 17). Plaintiff admits he hit a couple of civilian cars. He was just leading the officers around town until he could find an area where he knew people so that there would be witnesses in case something "drastically" happened. (*Id*. at 18). Plaintiff admitted he went through several parking

---

[4] The photographs show some small abrasions on Plaintiff's right arm near his elbow; abrasions to the right side of his forehead; and, what appears to be a small contusion above his left eyebrow. (ECF No. 31-1 at 9-12).

8

lots, and named FedEx, Home Depot, and Academy Sporting Goods. He admitted the parking lots were full of people, but he was "just trying to get away without hurting anybody." (*Id*. at 19-20).

Plaintiff said his hands were still in the air when they pulled him out of the truck and threw him face down on the ground. Plaintiff first states he does not remember if his hands stayed above his head as he went to the ground. He then states it would have been impossible to both have his hands in the air and also underneath his body. (*Id*. at 27-28). He states he was punched and kicked and kneed while he was down. (*Id*. at 29-30). He states he was struck in the face, ribs, "butt bone," and the back of his legs. (*Id*.). He could not tell who did what because he was on the ground getting arrested. (*Id*. at 30). He was on his stomach the entire time of the arrest; never on his back. (*Id*. at 32). He testified he received cuts and abrasions to his head, arm, "a little bit of stuff on my ribs," and a broken tooth. (*Id*. at 34). Later in the deposition he stated his cuts were on his forehead, in the temple area, on the back of his arm, on his elbow, and some bruising on his ribs. (*Id*. at 42).

Plaintiff saw a nurse at SCDC the same day he was booked into jail. (*Id*. at 35). She took pictures and put him on a list to be seen by a dentist. (*Id*. at 35, 44). He did not receive sutures or other treatment, including any band-aids. He says he had to wash the blood away himself. (*Id*. at 43). He then was examined by a doctor at either 24-48 hours or 48-72 hours after the arrest. (*Id*. at 35, 43). The doctor gave him some pain medication, but he did not know what medication he was given. (*Id*. at 35). He was seen by a dentist a couple of days after the arrest. (*Id*. at 44). He asked "the lady at the jail," he thought a corporal, to go to the emergency room. He states she told other officers it was protocol to take him to the emergency room after a high-speed chase. (*Id*. at 35). He also verbally asked to go to the emergency room by "yelling it out to everybody" when he got to jail. He talked to Defendant Short on the 10-minute drive to the jail, but he did not ask

to go to the emergency room. Defendant Short did not tell him that he would not take him to the emergency room. Plaintiff alleges Defendant Short's denial was apparent because he did not drive him to the emergency room. (*Id*. at 37). Plaintiff stated that he considered everyone who was involved that day responsible for his lack of medical care. "If you didn't take me to the hospital and you was (sic) a part of this, you're getting a medical claim against you." (*Id*. at 39-40). Plaintiff washed the cuts himself, and, other than the pain medication, received no other treatment. He felt he should have been "properly examined." (*Id*. at 46).

Plaintiff admitted he had been drinking early that day – probably around 5:00 or 6:00 in the morning. He had a couple of shots at that time, and the night before he and his brother had drunk "a little bit out of a whiskey bottle," but he stated he was not drunk at the time of the chase or arrest. (*Id*. at 51). Plaintiff testified that he swerved in front of Defendant Short during the chase so that Defendant Short could not complete a "pit" maneuver to stop him because he was getting ready to stop soon. (*Id*. at 54). When asked if he had any permanent injuries from the incident, he stated "I don't know." (*Id*. at 57). He does believe he had emotional damage. (*Id*. at 56).

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. ANALYSIS

Defendant Barentine argues he is entitled to qualified immunity because: (1) his use of force against Plaintiff was objectively reasonable given the totality of the circumstances; (2) Plaintiff suffered only *de minimis* injuries during the arrest; and, (3) there is no evidence of deliberate indifference to support a denial of medical care claim. (ECF No. 32 at 17).

Defendant Shelby argues he is entitled to qualified immunity because (1) there was no unconstitutional use of force during the arrest, and (2) if there was any unconstitutional use of force, the arrest incident occurred too quickly for him to intervene. (ECF No. 32 at 13-14).

Defendant Short argues he is entitled to summary judgment because: (1) Plaintiff cannot establish the elements of an excessive force claim; (2) Plaintiff cannot establish the elements of a failure to seek medical care claim; and, (3) even if a constitutional violation has been shown, he is entitled to qualified immunity. (ECF No. 37 at 8-20).

Plaintiff argues there were errors in Defendant Short's reports concerning the arrest incident. Specifically, he states the he did not hit the brakes to try to get Defendant Short to hit him; he did not swerve the truck towards Defendant Short and strike his patrol car; Defendant

11

Short forged the information that Plaintiff was under the influence of alcohol; and, Plaintiff did not indicate that he had a weapon in his waistband. Plaintiff therefore argues Defendant Short is not "reliable or believable." (ECF No. 45 at 2-3). Plaintiff states he did not refuse to open the truck door, but instead told the officers he could not open the truck door. He further states he never refused any order during the arrest. (*Id*. at 3). Plaintiff states Defendant Barentine had control of one of Plaintiff's arms at the time he delivered the blows and indicates there is confusion in the record as to whether he was on his stomach, side, or back. He states he was yelling "I'm sorry" and "I give up." He argues that "Refusing & Resisting arrest while begging for mercy is highly unlikely." (*Id*. at 3). He states he never refused medical care and was seen by a physician and a dentist at SCDC. The physician gave him pain medication for his injuries and the dentist extracted his broken tooth. (*Id*. at 4).

### A. Excessive Force During Arrest

Any § 1983 claim that law enforcement officials "used excessive force in the course of making an arrest, investigatory stop, or other 'seizure'" of a citizen is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The inquiry:

> "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight. Courts must consider the reasonableness of a particular use of force ... from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

*Frederick v. Motsinger*, 873 F.3d 641, 646 (8th Cir. 2017) (internal citations and quotations omitted). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. "[T]he infliction of only *de minimis* injuries supports the conclusion that the officer did not use

excessive force." *Brossart v. Janke*, 859 F.3d 616, 626 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 2025 (2018).

Plaintiff's actions leading up to his arrest meet each of the factors in the objective reasonableness standard. He was seen driving a stolen truck – a serious crime. There is no question he attempted to evade arrest through flight when he ran from an Arkansas State Trooper and several Fort Smith Police officers in a one-ton flatbed dually diesel work truck at high rates of speed through Fort Smith, including busy streets, shopping areas, and residential areas in the middle of the day for at least ten minutes. During the chase, he narrowly missed a head-on collision with Defendant Short; narrowly missed several vehicles on the road and in parking lots; and, he deliberately rammed in between two vehicles sitting at a stoplight. Plaintiff also used the size of the truck to prevent Defendant Short from forcibly stopping the vehicle with his patrol car. Although not apparent on the video, Defendants also state they utilized stop sticks at several locations, and as Plaintiff avoided stop sticks on Zero street he almost struck Officer Creek. (ECF No. 32 at 3). Plaintiff's actions, therefore, posed a serious threat of harm to the officers and others in that he used the truck as a one-ton weapon in his attempted escape. While none of the officers were injured in the chase, the individuals in the vehicles rammed by Plaintiff while they were stopped at a red light were not so fortunate. (ECF Nos. 31-4 at 18-19; 32 at 10).

Plaintiff then failed to open the door of the truck when the truck stopped. His allegation that he thought the truck door was blocked is clearly contradicted by the dashcam video, in which Plaintiff has his head and arms out of the window and can clearly see that the front of the patrol car does not extend past the bed of the truck. It did not block the back door, let alone the front door. When the officers opened the door, Plaintiff pulled back slightly into the cab of the truck. Given the combination of Plaintiff's failure to open the door, his leaning back into the cab when

13

the officers reached for him, and his actions during the high-speed chase, it was reasonable for the officers to forcibly remove him from the truck and take him to the ground at that point. *See Wertish v. Krueger*, 433 F.3d 1062, 1066-67 (8th Cir. 2006) (When plaintiff drove erratically and ignored both siren and flashing lights, then did not comply with orders to exit the vehicle, it was reasonable for the officer to pull him from the vehicle to the ground and forcibly handcuff him.).

Plaintiff alleges that he obeyed orders and did not make any representations that he had a weapon. Given that Plaintiff had just used a stolen one-ton truck as a weapon in his 10-minute attempt to evade arrest, it was reasonable for Defendants to believe that he might have other weapons on his person and be willing to use them. Further, at the time of the arrest, Defendant Short and the other officers knew nothing about this suspect, including his identity, motive for fleeing, or criminal history. (ECF No. 37 at 11).

Plaintiff's allegation that he obeyed all orders during the arrest is also contradicted by the record. As discussed above, he failed to obey orders to open the truck door and failed to obey orders not to move. Although his actions were not directly visible on the ground, the movements of the officers made it clear that he was not laying quietly on the ground to be handcuffed. Plaintiff's own statement that one of the officers had control of *one* of his arms indicates they did not have control of both arms, as is necessary for handcuffing. As such, the officers' actions in delivering several knee and hand strikes during a struggle of about one minute was objectively reasonable. *See Brossart*, 859 F.3d at 625 ("Law enforcement officers may use physical force to subdue an arrestee when he fails to comply with orders to lie still during handcuffing."); *Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994) ("When an arrestee flees or resists, some use of force by the police is reasonable."). Whether Plaintiff was on his side, back, or belly while he remained unhandcuffed does not materially affect the reasonableness of the officers' actions.

14

Plaintiff's *de minimis* injuries also support the conclusion that excessive force was not used against him. "Claims under the Eighth Amendment require a compensable injury to be greater than *de minimis*." *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008). Whether an injury is sufficiently serious is "claim dependent." *Id.* at 447. "No clear line divides *de minimis* injuries from others." Several Circuits have utilized the test enunciated in *Luong. v. Hatt*, 979 F. Supp. 481, 486 (N.D. Texas Sept. 11, 1997) to evaluate the seriousness of the injury. In analyzing an Eighth Amendment failure to protect claim, the court first noted that *Siglar v. Hightower*, 112 F.3d 191 (5th Cir 1997) provided no definition of a physical injury or a *de minimis* injury pursuant to 1997e(e). *Id.* at 486. It then stated that a physical injury is:

> "an observable or diagnosable medical condition requiring treatment by a medical professional. It is not a sore muscle, an aching back, a scratch, an abrasion, a bruise, etc. which lasts even up to two or three weeks . . . Injuries treatable at home [by a free world citizen] and with over-the-counter drugs, heating pads, rest, etc., do not fall within the parameters of 1997e(e). . .

*Id.*; *See also Perez v. United States*, 330 F. App'x 388, 389 (3d Cir. 2009) and *Jarriett v. Wilson*, 162 F. App'x 394, 401 (6th Cir. 2005) (using the *Luong* test).

The injuries observable in the video and photographs were abrasions on his right forehead, an abrasion or scratch on his right cheek, a small bruise above his left eyebrow, and a small abrasion on his arm. Plaintiff also alleges he had some bruising on his ribs, as well as a broken tooth. He was conscious and coherent immediately after the struggle, able to easily raise and lower his body across the patrol car seat without the use of his hands. His actions therefore contradict his allegation of injured ribs. Plaintiff's injuries resulting from the arrest are clearly *de minimis* in that they consisted of abrasions, a cut or scrape, and some bruising that would be easily treated at home by a free-world citizen. Indeed, the medical professionals who examined him did not deem them serious enough to need a band-aid. The dashcam video and photographs also contradict

Plaintiff's allegation that the broken tooth was caused by the arrest. At no time is Plaintiff heard to complain of a broken tooth during his arrest, nor is there any apparent injury to Plaintiff's mouth.

Plaintiff's *de minimis* injuries support a finding that the use of force in his arrest was not excessive. Defendants' use of force to arrest Plaintiff was therefore objectively reasonable and Plaintiff suffered only *de minimis* injuries. No material question of fact remains, and Defendants are entitled to summary judgment as a matter of law.

### B. Denial of Medical Care

Plaintiff's allegation that he was denied medical care because he was not taken to an emergency room after his arrest and was therefore not "properly examined" is contradicted by the record. The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to prisoners' serious medical needs. *Luckert v. Dodge County*, 684 F.3d 808, 817 (8th Cir. 2012). To prevail on his Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show that he suffered from an objectively serious medical need Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citation omitted).

For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs,* 512 F.3d 488, 499 (8th Cir. 2008) (citation omitted). "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id.*

It is well settled that "[a] prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." *Nelson v. Shuffman,* 603 F.3d 439, 449 (8th Cir. 2010) (internal citation omitted). An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Id.* (internal citations omitted). Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment, and whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference. *See Smith v. Jenkins,* 919 F.2d 90, 93 (8th Cir. 1990).

Deliberate indifference may also be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle,* 429 U.S. at 104–05. However, the "Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin, Minn.,* 557 F.3d 628, 633 (8th Cir. 2009). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials 'ignored an acute or escalating situation or that [these] delays adversely affected his prognosis[,]'" *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (citations omitted), unless the need for medical attention is obvious to a layperson, in which case the plaintiff need not submit verifying medical evidence to show the detrimental effects of delay.

*See Schaub,* 638 F.3d at 919 (citing *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999)); *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir. 1995); *cf. Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) ("noting that a delay in treatment, coupled with knowledge that an inmate is suffering, can support a finding of an Eighth Amendment violation").

Plaintiff's abrasions, bruises, and cuts do not meet the first prong of the deliberate indifference test. The medical professionals who examined Plaintiff determined that he did not require any medical treatment for injuries arising from his arrest.[5] His injuries were examined by a nurse the same day as his arrest and were determined to be non-serious. Per Plaintiff's deposition testimony, the injuries did not require sutures or other treatment, including band-aids. Plaintiff also testified that he was seen by a doctor somewhere between 24 to 72 hours after his arrest. This doctor did not prescribe any treatment other than some unidentified pain medication.

Plaintiff's allegations also fail to meet the second prong of the deliberate indifference test. During the drive to SCDC after the arrest, Plaintiff did not complain of injury or pain, and did not ask for medical care. Based on his deposition testimony, Plaintiff was seen by a nurse in SCDC the same day he was arrested and booked in to the facility. She immediately scheduled him for dental care, which he received within a week. He was also seen by a doctor within a few days and was given pain medication. Nothing in these facts indicates that prison officials actually knew of but deliberately disregarded any of Plaintiff's medical needs. That Plaintiff believes he should have been taken to the emergency room after his arrest and was therefore not "properly examined" is insufficient to state a claim for deliberate indifference. Instead, Plaintiff merely disagrees with the medical opinions of both the nurse and the doctor who examined him. His mere difference of

---

[5] Plaintiff also received prompt dental care for a broken tooth which the proof fails to show was caused by his arrest.

18

opinion over matters of expert medical judgment or a course of medical treatment does not rise to the level of a constitutional violation.

Finally, Plaintiff failed to provide any verifying medical evidence showing that he suffered any lasting detrimental effects from not being taken to the emergency room to be "properly examined." Instead, he testified that his cuts and abrasions healed with perhaps some scars on his arm, but none on his face. (ECF No. 31-4 at 48). When asked if he suffered any permanent injuries from the arrest he testified, "I don't know." (ECF No. 31-4 at 57).

No material question of fact remains, and Defendants are entitled to summary judgment as a matter of law.

### C. Qualified Immunity

Because there were no violations of Plaintiff's constitutional rights, it is not necessary to address the issue of qualified immunity.

### IV. CONCLUSION

For these reasons, IT IS ORDERED that Plaintiff's claims are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED this 1st day of May 2019.

*/s/ P. K. Holmes, III*
P. K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE